# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,

                                       Case No. 21-cr-20665
                                        Hon. Terrence G. Berg

v.

SAMANTHA GILLIAM,

                 Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

Samantha Gilliam turned her home into a tool for the exploitation of vulnerable women and distribution of dangerous drugs. Gilliam and her fiancé, Quiyemabi Summerlin, colluded to provide victims with a constant supply of heroin and crack cocaine, while requiring them to perform commercial sex dates to fund their livelihood. Gilliam and Summerlin's business model was coercive and effective, as they successfully manipulated numerous victims' severe drug addictions over the course of years. At best, Gilliam turned a blind eye towards Summerlin's occasional use of violence and sexual assault to ensure his victims' compliance; at worst, she was a participant and co-conspirator.

1

Gilliam's conduct was severe and caused harm to numerous victims. For the reasons stated below, the government recommends that the Court impose a sentence of 108 months.

### *Procedural History*

A February 2022 criminal complaint charged Gilliam with conspiracy to engage in sex trafficking and maintaining a drug premises. (PSR ¶ 1). Gilliam made her initial appearance on the complaint on March 4, 2022, and was released on bond pending trial. (PSR ¶ 3).

On April 12, 2022, a grand jury returned a superseding indictment charging Gilliam as a second defendant with conspiracy to engage in sex trafficking, two substantive counts of sex trafficking by force, fraud, or coercion, and maintaining a drug premises. (PSR ¶ 4).

On May 24, 2023, a Second Superseding Indictment charged Gilliam with conspiracy to engage in sex trafficking (Count 1), substantive counts of sex trafficking victims AV-1, AV-4, AV-5, and AV-6 (Counts 2, 6, 7, and 8), and maintaining a drug premises (Count 10).

On April 30, 2024, Gilliam pleaded guilty with a Rule 11 agreement to Counts 1 and 10 of the Second Superseding Indictment.

(PSR ¶ 12).

## ***Statement of Facts***

In 2021, the FBI encountered numerous women that reported being forced by someone named "Q" to perform commercial sex dates in the basement of a home in Detroit in exchange for drugs. Some women reported violence or being locked in the basement. The FBI identified the house as belonging to Gilliam and identified "Q" as Quiyemabi Summerlin, a 41-year-old convicted felon and sex offender. (PSR ¶ 16).



On October 14, 2021, the FBI executed a search warrant at Summerlin and Gilliam's house in Detroit, near the Grosse Pointe border. Summerlin was present; Gilliam was not home. The FBI found two women in the basement of the home, and both made statements that they

had been trafficked. Both women were pregnant. Blood draws confirmed

that they had narcotics in their system. A search of Summerlin and

Gilliam's house recovered cocaine, heroin, fentanyl, and a firearm. (PSR ¶

18). This included finding narcotics on a plate in a pink-painted room on

the main floor of the home:







Summerlin was arrested and charged in a criminal complaint the next day. Just a few weeks after his arrest, Summerlin began calling Gilliam from jail. Summerlin told Gilliam to begin "checking in" on Adult Victim 6 (AV-6), one of the trafficking victims who had been in the home the day the FBI executed the search warrant, to make sure that "everything straight." (PSR ¶ 19). Gilliam then began contacting AV-6 to intimidate her under the misperception that if AV-6 did not

participate in the prosecution of Summerlin, his charges would be dismissed. Gilliam texted things to AV-6 like the following statement from December 2021: "bitch u got paperwork to sign so u can be out of it so he can get out." *Id.* Gilliam affirmed her allegiance to Summerlin in additional jails and continued to harass AV-6 through February 2022, when she further threatened AV-6 harm if AV-6 participated in Summerlin's prosecution. (PSR ¶ 20).

After Summerlin's arrest, the FBI worked relentlessly to identify women that had been trafficked by Summerlin and Gilliam in her home. In total, the case agent identified and interviewed over 20 women who performed commercial sex dates at Gilliam's house in exchange for narcotics.

At the hands of Summerlin, the women had similar experiences. They reported that Summerlin lived in the house with Gilliam and her children. Gilliam worked a normal job while Summerlin kept drug-addicted women in the basement. The basement had a bedroom, seen below, and a bathroom.



Summerlin gave the women cocaine, fentanyl, and heroin on a plate and arranged commercial sex dates for the women, and they gave the money from customers directly to him before the date. Some women were allowed to come and go, but others reported being locked in the basement. Some reported that Summerlin was violent with them. Many reported that he raped them. (PSR ¶¶ 22-26).

But several women also reported that if Summerlin was not in the house at the time a commercial sex date occurred, they would give the money to Gilliam, who never questioned why she was receiving money from women living in her basement. In fact, Gilliam was very aware of the victims present in her home; she did laundry in the basement. (PSR ¶¶ 22-26).

One victim, AV-3, reported that on one occasion, she overdosed while in Gilliam's basement and after another victim gave her Narcan,

AV-3 awoke to Gilliam and Summerlin standing over her. (PSR ¶ 24). AV-3 also reported that she had discussed with Gilliam how much money each victim earned per day from commercial sex dates, and once told Gilliam that Summerlin had sexually assaulted her; Gilliam responded to AV-3 with a threat to harm her. (*Id.*)

It was on this occasion that AV-3 left Gilliam's home for the last time. Summerlin had gotten angry with AV-3 because she tried to keep some of the money she had earned from a commercial sex date. Summerlin grabbed AV-3's hair and hit her in the face with a firearm. AV-3 fled out of the house's side door and tried to call 911, but Summerlin grabbed her phone and smashed it. Summerlin hit AV-3 in the face again before she ran to the front of the house, where two individuals had stopped to render aide. When an ambulance arrived, Summerlin threatened to kill AV-3 if she tried to participate in a prosecution against him. (*Id.*) Police observed a laceration on AV-3's face and an injury to her knee, and she was taken to the hospital. A police officer spoke with Summerlin, who claimed AV-3 was homeless and he and Gilliam had allowed her to stay in their home for the night. A different officer spoke to Gilliam, who claimed that she had woken up

because of a strange noise in her home and had thrown AV-3 out:

P.O. PAUL SPOKE WITH SAMANTHA CHRISTINE GILLIAM (INVOLVED OTHER) WHOM STATED THAT APPROXIMATELY AT 4:30 A.M. SHE AND HER HUSBAND AWOKE TO A DISTURBANCE IN THE BATHROOM AT WHICH POINT SHE THREW [AV-3] OUTSIDE AND ASSAULTED HER.

## *Relevant § 3553(a) Factors*

Title 18, United States Code, section 3553(a) provides the relevant objectives and factors to be considered by sentencing courts when determining a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution. The most relevant factors to Summerlin's case are evaluated below.

### *The Sentencing Guidelines Range*

Although advisory, the Sentencing Guidelines remain an important factor under § 3553(a) when determining an appropriate

sentence. Prior to Gilliam's guilty plea, the government estimated that her advisory guideline range would be 108 to 135 months.

The Probation Department calculated a higher guideline range than anticipated by the parties, based on U.S.S.G. § 2G1.1(d)(1) (as to Count 1). (PSR ¶ 33). This section provides that "if the offense involved more than one victim, Chapter Three, Part D (Multiple Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction." (PSR ¶ 33). Therefore, the Probation Department calculated five sets of guidelines, one for each victim associated with Gilliam in the Second Superseding Indictment. Accordingly, the Probation Department concluded that Gilliam's guideline range is 168 to 210 months. (PSR ¶ 122).

### *Nature and Circumstances of the Offense*

Gilliam helped her fiancé commit multiple crimes over the course of years. She gave Summerlin a home that provided cover for his dark deeds and further allowed him to cut off his victims from the rest of the world, thereby increasing their dependence on him and his drugs. Gilliam allowed those dangerous drugs to be sold from her home, given

to women who were made to do commercial sex dates from her basement, and kept in places where her children could have access to them.

In a victim impact statement, AV-4 adeptly explains Gilliam's role in her exploitation and addresses the potential perception that Gilliam is somehow less culpable. (Exhibit A, AV-4 Victim Impact Statement, *filed under seal*.) In part, AV-4 writes "Gilliam was at Mr. Summerlin's beck and call," including participating in arrange for commercial sex dates. AV-4 further says:

> [Gilliam] may not have physically put her hands on me or took part in raping me, but she sat back and allowed all of these things to happen while 100% supporting and assisting Mr. Summerlin. Ms. Gilliam supported Mr. Summerlin's whole operation and constantly discussed how much money her and Mr. Summerlin were obtaining every day from each woman.

(*Id.*) AV-4 pointedly discusses that it was because of Gilliam that Summerlin could be so successful. And because of Gilliam's allegiance to Summerlin above all-else, Gilliam never sought to help any of the victims despite having every opportunity. "She ate, slept, raised her children and fed her dog as normal under the same roof in which I endured many different forms of abuse." (*Id.*) Consistent with Gilliam's

11

text messages to AV-6, AV-4 also writes that after Summerlin's arrest, Gilliam tried to make contact with AV-4 through AV-4's friends, presumably in an attempt to tamper with AV-4.

For the reasons articulated by AV-4 in her impact statement, the nature and circumstances of Gilliam's offense calls for a custodial sentence of 108 months.

### *History and Characteristics of the Offender*

Gilliam is a mother to two children. She has had steady employment. And it is precisely these two things that allowed her to successfully help Summerlin achieve his objectives. Gilliam's childhood was not free from trauma, and she reports having suffered through an abusive relationship with a different man. However, it is not clear that Summerlin abused her or threatened her in order to get her to assist him in trafficking women. While Gilliam claims in her sentencing memorandum that Summerlin was manipulative, abusive, and would beat her when she tried to end the relationship, she did not report any of this to the Probation Department. Also, as noted above, she lied to the police about AV-3, and it was not Gilliam who called 911 to have AV-3 removed from her home. Despite her overtures in her sentencing

memorandum, there is no evidence to suggest that Gilliam ever tried to stop Summerlin. In fact, her actions suggest otherwise. Even after Summerlin was arrested, and while away from him and in a place of safety, Gilliam continued to assist him in his endeavors to reach potential witnesses. Even more contrary to Gilliam's statements in her memorandum is the fact that after his admissions, both guilty pleas, and facing sentencing for conspiracy to engage in sex trafficking by force, fraud, or coercion and maintaining a drug premises in her family home, Gilliam said that she is open to the possibility of living with Summerlin again after his release from custody. (PSR ¶ 96). Gilliam's history and characteristics thus weigh in favor of a custodial sentence.

### Seriousness of the Offense, Promoting Respect for Law, and Providing Just Punishment

Gilliam worked with her fiancé to help exploit vulnerable women who were addicted to dangerous drugs to earn a profit. She willfully turned a blind eye to Summerlin's violence and allowed these crimes to occur in the same home where her children lived. These crimes are serious in both scope and reach, and have profoundly impacted the women who were exploited. Summerlin leveraged Gilliam's assistance and learned the vulnerabilities of women addicted to controlled

substances to turn their struggles into a business model. With Gilliam's help, Summerlin withheld drugs from women he recruited to live in Gilliam's basement to coerce them to perform commercial sex dates so that he could make more money. As evidenced by the longevity of the conspiracy, the physical agony and psychological trauma suffered by these women were of no consequence to Gilliam or Summerlin. Summerlin's violence and coercive tactics are reprehensible, but so is the fact that Gilliam allowed this business to continue for so long in the name of earning money and at the expense of the lives of other women.

AV-4 explains in her impact statement that she has been fearful every day that Gilliam is allowed to remain out of custody because of the possibility of retribution at the direction of Summerlin. (Exhibit A, AV-4 Victim Impact Statement, *filed under seal*).

In order to acknowledge the seriousness of Gilliam's offense, promote respect for the law by acknowledging the real victimization of those she harmed, and provide just punishment, the Court needs to impose a significant custodial sentence. A sentence of 108 months would be sufficient, but not greater than necessary to achieve those objectives.

### *Deterrence*

The above considerations impact another § 3553(a) factor – the need to deter such conduct in the future. Sentencing in the federal system has long contemplated the ability to provide both specific and general deterrence. *United States v. Phinazee*, 515 F.3d 511 (6th Cir. 2008); *United States v. Blackwell*, 459 F.3d 739, 774 (6th Cir. 2006). It is important to note here that Gilliam has never claimed to be a victim of Summerlin's sex trafficking, and there is no evidence to suggest that she had been. A custodial sentence is necessary so that Gilliam and others will understand the consequences of sex trafficking and drug trafficking offenses, and deter her and others from engaging in this conduct in the future.

### *Avoiding unwarranted sentence disparities*

A custodial sentence is necessary to avoid unwarranted sentencing disparities. The mandatory minimum sentence for just one substantive count of sex trafficking by force, fraud, or coercion is 15 years. Gilliam does not face that same mandatory minimum sentence with her plea to Count 1. But Summerlin, with whom she conspired and provided a place free from reproach for him to affect his harmful business model,

received a sentence of 210 months in prison. A significant custodial sentence is appropriate for Gilliam who engaged in similar conduct and helped Summerlin to exploit vulnerable women by increasing their drug-dependency, and will avoid unwarranted sentencing disparities.

### *Conclusion*

For the reasons stated above, the United States asks the Court to impose a custodial sentence of 108 months in Bureau of Prisons. Such a sentence is sufficient, but not greater than necessary to achieve the purpose of sentencing.

Respectfully submitted,

DAWN N. ISON
UNITED STATES ATTORNEY

*/s Tara M. Hindelang*
TARA M. HINDELANG
SARA D. WOODWARD
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: 313-226-9100

November 14, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Christopher Sinclair, counsel of record.

<u>/s Tara M. Hindelang</u>
Tara M. Hindelang
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9543
tara.hindelang@usdoj.gov

November 14, 2024